Jeffrey M. Hindoien
Gough, Shanahan, Johnson & Waterman, PLLP
33 S. Last Chance Gulch
Helena, MT 59601
T: (406) 442-8560
F: (406) 442-8783
jeffh@gsjw.com

Michael J. McGrady
Wyoming Attorney General's Office
123 State Capitol
Cheyenne, WY 82002
T: (307) 777-6946
F: (307) 777-3542
mike.mcgrady@wyo.gov

*Attorneys for Defendant-Intervenor*
*State of Wyoming*

[additional counsel listed below]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| DEFENDERS OF WILDLIFE,<br><br>Plaintiff,<br><br>v.<br><br>SALLY JEWELL, in her official capacity as Secretary of the U.S. Department of the Interior; DANIEL M. ASHE, in his official capacity as Director of the U.S. Fish and Wildlife Service,<br><br>Defendants, | CV 14-246-M-DLC<br><br>(Consolidated with Case Nos. 14-247-M-DLC and 14-250-M-DLC) |

and

IDAHO FARM BUREAU
FEDERATION; WYOMING FARM
BUREAU; MONTANA FARM
BUREAU FEDERATION;
WASHINGTON FARM BUREAU;
IDAHO STATE SNOWMOBILE
ASSOCIATION; COLORADO
SNOWMOBILE ASSOCIATION;
COLORADO OFF-HIGHWAY
VEHICLE COALITION; AMERICAN
PETROLEUM INSTITUTE; MONTANA
PETROLEUM ASSOCIATION;
WESTERN ENERGY ALLIANCE;
GOVERNOR C.L. "BUTCH" OTTER;
STATE OF MONTANA; MONTANA
FISH, WILDLIFE AND PARKS; and
STATE OF WYOMING,

       Defendant-Intervenors.

---

**DEFENDANT-INTERVENOR STATES OF IDAHO, MONTANA, AND
WYOMING'S MEMORANDUM IN SUPPORT OF COMBINED CROSS-
MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
CONSERVATION ORGANIZATIONS' MOTIONS FOR SUMMARY
JUDGMENT**

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ................................................................................. 1

BACKGROUND ................................................................................... 2

I.    The Wolverine .......................................................................... 2

II.   State Management of the Wolverine .......................................... 3

    a.  Idaho's Wolverine Management ............................................ 4

    b.  Montana's Wolverine Management ......................................... 5

    c.  Wyoming's Wolverine Management ....................................... 7

III.  The Endangered Species Act ..................................................... 9

IV.   The Service's Listing Review for the Wolverine ........................ 11

    a.  The Petition to List and the Twelve-Month Finding ............... 11

    b.  The Proposed Listing Decision ............................................ 11

    c.  The Peer Review Process ..................................................... 13

    d.  The Public Comment Process ............................................... 14

    e.  The Expert Panel ................................................................. 15

    f.  The Findings of the Service's Regional Director ................... 16

    g.  The Final Listing Decision ................................................... 19

STANDARD OF REVIEW ................................................................... 20

ARGUMENT ...................................................................................... 20

i

I.    The Service properly determined that the ESA's statutory criteria does not support a "threatened" listing of the Contiguous DPS ..................20

   a.   The Service properly determined that the anticipated effects of climate change do not merit a "threatened" listing ..............................21

   b.   The Service properly determined that factors other than climate change do not merit listing .........................................................23

      i.   The Service properly determined that population size and genetic diversity do not merit listing ............................................24

      ii.  The Service properly determined that existing regulatory mechanisms do not merit listing............................................27

      iii. The Service properly determined that cumulative effects do not merit listing ...............................................................28

II.   The Conservation Organizations did not show that the Service acted improperly ................................................................30

   a.   The allegations of improper influence are without merit ........................30

   b.   The Conservation Organizations misrepresent the deliberative process inherent to rulemaking............................................32

III.  The Service properly determined that the wolverine is not "threatened" throughout a "significant portion of its range" ......................33

   a.   The phrase "significant portion of its range" ............................................33

   b.   The Service's SPR interpretation is reasonable and entitled to deference................................................................................35

   c.   The Service properly conducted the SPR analysis...................................40

CONCLUSION ....................................................................................41

# TABLE OF AUTHORITIES

## CASES

*Batterton v. Marshall*,
648 F.2d 694 (D.C. Cir. 1980) ................................................................22

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................23

*Ctr. for Biological Diversity v. Kempthorne*,
No. CIV 03–252 LFG/LAM, 2007 WL 6477262 (D.N.M. July 2, 2007) ..............34

*Ctr. for Biological Diversity v. Norton*,
411 F. Supp. 2d 1271 (D.N.M. 2005) ......................................................34

*Chevron v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ................................................................34-36, 38-40

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ........................................................................31, 33

*City of Arlington v. FCC*,
--- U.S. ---, 133 S. Ct. 1863 (2013) ......................................................34, 38

*Colo. River Cutthroat Trout v. Salazar*,
898 F. Supp. 2d 191 (D.D.C. 2012) ..........................................................30

*Cook Inlet Beluga Whale v. Daley*,
156 F. Supp. 2d 16 (D.D.C. 2001) ..................................................24, 26, 32

*Defenders of Wildlife v. Jewell*,
No. 13–0919(RC), 2014 WL 4829089 (D.D.C. Sept. 30, 2014) ..............................22

*Defenders of Wildlife v. Kempthorne*,
535 F. Supp. 2d 121 (D.D.C. 2008) ..........................................................25

*Defenders of Wildlife v. Norton*,
258 F.3d 1136 (9th Cir. 2001) ..........................................................33-35, 37-39

*Earth Island Inst. v. U.S. Forest Serv.*,
442 F.3d 1147 (9th Cir. 2006) ...............................................................38

*Friends of Blackwater v. Salazar*,
691 F.3d 428 (D.C. Cir. 2012) ..............................................................28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins.*,
463 U.S. 29 (1983) ...........................................................................29, 30

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007) ..............................................................................32

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) .......................................................................... 38-40

*Nat'l Fisheries Inst. v. Mosbacher*,
732 F. Supp. 210 (D.D.C. 1990) ...........................................................33

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
384 F.3d 1163 (9th Cir. 2004) ...............................................................32

*Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv.*,
475 F.3d 1136 (9th Cir. 2007) ............................................... 21-23, 35, 37

*River Runners for Wilderness v. Martin*,
593 F.3d 1064 (9th Cir. 2010) ...............................................................20

*Rocky Mountain Wild v. U.S. Fish and Wildlife Serv.*,
No. CV 13–42–M–DWM, 2014 WL 7176384 (D. Mont. Sept. 29, 2014) ...............28

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) ................................................................10

*Serono Labs., Inc. v. Shalala*,
158 F.3d 1313 (D.C. Cir. 1998) ............................................................32

*Sierra Club v. Costle*,
657 F.2d 298 (D.C. Cir. 1981) ..............................................................31

iv

*Sw. Ctr. for Biological Diversity v. Norton*,
No. 98–934 (RMU/JMF), 2002 WL 1733618 (D.D.C. July 29, 2002) ...................25

*Trout Unlimited v. Lohn*,
559 F.3d 946 (9th Cir. 2009) ........................................................................23, 25

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .............................................................................................38

**STATUTES**

16 U.S.C. §§ 1131 through -1136 .....................................................................27

16 U.S.C. §§ 1531 through -1544 ...............................................................*passim*

Idaho Admin. Code 13.01.06.200 ......................................................................4

Idaho Code § 36-103 .........................................................................................4

Mont. Code Ann. § 87-1-201 .............................................................................5

Mont. Code Ann. § 87-1-301 .............................................................................5

Wyo. Stat. Ann. § 23-1-101 ..............................................................................7

Wyo. Stat. Ann. § 23-1-103 ..............................................................................7

Wyo. Stat. Ann. § 23-1-302 ..............................................................................7

**CODE OF FEDERAL REGULATIONS**

50 C.F.R. § 424.11 ..........................................................................................28

**ADMINISTRATIVE MATERIALS**

75 Fed. Reg. 78030 (Dec. 14, 2010) .............................................................2, 11

76 Fed. Reg. 76987 (Dec. 9, 2011) .............................................................34, 35

78 Fed. Reg. 7864 (Feb. 4, 2013) ...............................................................*passim*

79 Fed. Reg. 37578 (July 1, 2014)............................................................... 35-37, 39

79 Fed. Reg. 47522 (Aug. 13, 2014)...............................................................*passim*

## OTHER AUTHORITIES

*Helena Hunters & Anglers v. Maurier*, Order Granting Joint Motion for
Dismissal with Prejudice, Sept. 2, 2014 (Montana First Judicial District,
Cause No. BDV-2012-868) ..........................................................................6

*Helena Hunters & Anglers v. Maurier*, Order Granting Joint Motion to
Stay Case, Feb. 27, 2013 (Montana First Judicial District, Cause No.
BDV-2012-868) ..........................................................................................6

*Helena Hunters & Anglers v. Maurier*, Order on Motion for Temporary
Restraining Order, Nov. 30, 2012 (Montana First Judicial District, Cause No.
BDV-2012-868) ..........................................................................................6

State Wildlife Action Plan (2010), *available at*
https://wgfd.wyo.gov/WGFD/media/content/PDF/Habitat/SWAP/
SWAP.pdf (last visited August 11, 2015)............................................. 7-9

## INTRODUCTION

This litigation involves challenges brought by three plaintiff groups (collectively the "Conservation Organizations") to the United States Fish and Wildlife Service's expert determination that the wolverine population located in the contiguous United States is not entitled to "threatened" status under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544. Specifically, the Conservation Organizations assert that the Service failed to properly consider the potential impacts of climate change and other factors to the wolverine. The Conservation Organizations also challenge the Service's interpretation and application of the ESA phrase "significant portion of its range." These arguments lack merit.

The Conservation Organizations' objections represent nothing more than competing interpretations of the available science and disagreement with the Service's ultimate findings. Such difference of opinion cannot satisfy the high threshold required to set aside a federal agency action.

The Service properly conducted the ESA analysis and determined that the best available science did not support a "threatened" listing of the wolverine. In so doing, the Service considered the relevant factors and presented a rational connection between the facts found and the choices made. As such, the Service's decision should be upheld. Accordingly, the states of Idaho, Montana, and Wyoming (collectively "the States") respectfully request that this Court deny the summary judgment

1

motions filed by the Conservation Organizations and grant the summary judgment motions filed by the United States Fish and Wildlife Service and the States.

## BACKGROUND

### I.   The Wolverine

The wolverine is the largest land-dwelling member of the weasel family. 78 Fed. Reg. 7864, 7866 (February 4, 2013). Approximately the size of a medium-sized dog, the wolverine is an opportunistic feeder that primarily scavenges carrion. 75 Fed. Reg. 78030, 78032 (Dec. 14, 2010). The wolverine has a Holarctic distribution, meaning that wolverine habitat is found in the northern continents. 78 Fed. Reg. at 7866. "Old World" wolverine currently inhabit much of Russia and the Nordic nations of Europe, while "New World" wolverine currently inhabit Canada, Alaska and portions of the western United States. *Id*. The southernmost portion of the wolverine's range, and the only portion within the contiguous United States, encompasses portions of Wyoming, Washington, Idaho, Montana, California, and Colorado. *Id*. at 7867.

Wolverine naturally occur in low population densities, with individual home ranges that often encompass hundreds of square miles. *Id*. Wolverine in western Canada and Alaska appear to be near maximum capacity. 75 Fed. Reg. at 78033. While exact population estimates are hard to come by, western Canada's wolverine population alone is estimated at over fifteen thousand individuals. *Id*.

The wolverine is an incredibly tough and resilient species. While the wolverine was likely extirpated from the contiguous United States by the early 1900s as a result of predator control efforts, the wolverine population in the contiguous United States rebounded dramatically in the second half of the twentieth century. 78 Fed. Reg. at 7872. This was likely due to recolonization from Canada. *Id*. Moreover, the wolverine population in the contiguous United States continues to expand, (AR-FR5358, 5632, 14030, 14055), with the species only occupying approximately half of its available habitat in the contiguous United States, (AR-FR05371). "In recent years, individual wolverines have been documented in Colorado (2010), the Sierra Nevada range in California (2008), and the Uinta Range of Utah and Wyoming (2014), indicating some dispersal to known unoccupied range is occurring[.]" 79 Fed. Reg. 47522, 47535 (Aug. 13, 2014).

## II.    State Management of the Wolverine

As detailed below, each of the States actively manages wolverine within its jurisdiction. Indeed, the States are currently working together with the state of Washington, the United States Forest Service, the United States Fish and Wildlife Service, and other entities to develop the first ever range-wide survey designed to estimate occupancy of the wolverine in the contiguous United States.[1]

---

[1]   https://www.wildlifemanagementinstitute.org/index.php?option=com_content&view=article&id=839:range-wide-wolverine-survey-moving-forward&catid=34:ONB%20Articles&Itemid=54 (last visited Aug. 17, 2015).

3

### a.  Idaho's Wolverine Management

The state of Idaho is entrusted with management authority over wildlife within its borders, which includes wolverine. Idaho Code § 36-103(a). Idaho takes its management authority seriously and has long been involved with wolverine conservation and monitoring. Idaho strongly supports continuing efforts to better understand wolverine migration and behavior. The state is an advocate for increased local and national coordination. Idaho is deeply committed to keeping this species a part of the State's natural heritage for present and future generations.

Idaho manages wolverine as a Protected Nongame Species, and there has not been a wolverine harvest season since 1965. Idaho Admin. Code 13.01.06.200. Following a substantial population decline in the early twentieth century, the population in Idaho rebounded. While the exact number of individuals is unknown, the current distribution of wolverine is believed to be similar to the species' historic extent in Idaho. *See* Idaho Dept. of Fish and Game, Management Plan for the Conservation of Wolverines in Idaho 10.[2]

Idaho has participated in a number of conservation efforts, including collaborative research projects, telemetry studies, surveys, and DNA collection. One such collaborative study is the Central Idaho Winter Recreation/Wolverine Project,

---

[2] Available at http://fishandgame.idaho.gov/public/wildlife/planWolverine.pdf (last visited Aug. 17, 2015).

4

which gathers and analyzes data through live trapping and GPS monitoring to better understand wolverine responses to winter recreation. (AR-LIT06662).[3]

In July 2014, the Idaho Department of Fish and Game published a Management Plan for the Conservation of Wolverines in Idaho, which was intended to "proactively lead state efforts to maintain viable populations in Idaho." (Idaho Wolverine Plan at v). The plan also directs conservation efforts and "advance[s] communication and collaboration among wildlife and land managers and the various constituencies important to wolverine conservation in Idaho." (*Id*.). In sum, Idaho is taking substantial proactive measures with the goal of ensuring the long-term persistence of wolverines in Idaho.

### b. Montana's Wolverine Management

Montana has specific statutory mandates for the supervision, management, and regulation of wildlife and wildlife habitat. *See* Mont. Code Ann. §§ 87-1-201 and 87-1-301.  Montana regulates wolverine as a furbearer, which has historically included a limited harvest through annual trapping seasons. *See* 78 Fed. Reg. 7864, 7881.

Montana contains "most of the habitat and wolverines that exist in the current range of the [distinct population segment.]" *Id*. at 7881. Under Montana's

---

[3]    Available    at    http://www.roundriver.info/where/wp-content/uploads/sites/3/2013/06/Wolverine-Winter-Recreation-Project-2014-Progress-Report-Final.pdf (last visited Aug. 17, 2015).

management, wolverine populations have "rebounded from historic lows in the early 1900s[.]" *Id*. Much of this expansion occurred in the presence of liberal trapping regulations that were in place for much of the 20th century. *See id*.

Before 2004, the annual wolverine harvest in Montana averaged 10.5 animals per year. *Id*. Montana subsequently adjusted its management strategy for wolverine, dividing the state into three units in order to more evenly distribute wolverine harvest across the state. *Id*. Montana made additional changes prior to the 2008-2009 season that further distributed harvest, entirely eliminating trapping in some isolated mountain ranges and setting a state-wide quota of five wolverine, no more than three of which could be females. *Id*.

In November 2012, a federal court temporarily enjoined Montana's wolverine trapping season. *See Helena Hunters & Anglers v. Maurier*, Order on Motion for Temporary Restraining Order, Nov. 30, 2012 (Montana First Judicial District, Cause No. BDV-2012-868). The parties subsequently agreed to stay the case. *See* Order Granting Joint Motion to Stay Case, Feb. 27, 2013 (Montana First Judicial District, Cause No. BDV-2012-868). In September 2014, the lawsuit was dismissed with prejudice. *See* Order Granting Joint Motion for Dismissal with Prejudice, Sept. 2, 2014 (Montana First Judicial District, Cause No. BDV-2012-868). Since that time,

neither the Montana Department of Fish, Wildlife and Parks nor the Montana Fish and Wildlife Commission have instituted new trapping seasons for wolverine.[4]

### c.  Wyoming's Wolverine Management

Wyoming has an established track record of successfully managing wildlife species within its borders, including the wolverine, and Wyoming takes this responsibility very seriously. All wildlife in Wyoming is the property of the State. Wyo. Stat. Ann. § 23-1-103. As a result, Wyoming currently maintains management authority over wolverines within its borders. Wyo. Stat. Ann. §§ 23-1-101, -302. Wyoming law classifies wolverines as "protected animals" and prohibits the trapping or hunting of wolverines within the state. *Id*.

In 2010, the Wyoming Game and Fish Department conducted a statewide inventory and prioritization of the conservation status of 180 wildlife species within Wyoming, including the wolverine. *See* State Wildlife Action Plan IV-i-5-9 (2010).[5] Based on the Department's analysis, the Wyoming Game and Fish Commission ranked the wolverine in Tier II, indicating that the species is of moderate conservation priority. *Id*. at IV-i-9.

---

[4] *See* http://fwp.mt.gov/hunting/planahunt/huntingGuides/furbearer(setting quota at zero wolverines in each of the state's four Wolverine Management Units) (last visited August 17, 2015).

[5]    Available    at    https://wgfd.wyo.gov/WGFD/media/content/PDF/Habitat/ SWAP/SWAP.pdf (last visited August 17, 2015).

While wolverine regularly dwell only in the subalpine coniferous forests and alpine habitats of northwest Wyoming, dispersing individuals have been documented in other areas of the state. *Id*. at IV-2 -94. Though wolverine population density remains low, the Game and Fish Department believes the wolverine population in Wyoming is actually at its highest level in the past 100 years and is increasing in size. *Id*.

In addition to classifying and protecting the species, Wyoming has commissioned wolverine studies. For example, a wolverine study in the Yellowstone ecosystem researched wolverine densities and population viability, habitats important to wolverine persistence, travel corridors between isolated mountain ranges, effects of human recreation, reproductive and survival rates, and mortality factors. State Wildlife Action Plan at I-I-3. The Department also studied the effects of winter recreation trails on wolverine. *Id*.

The Department also promotes the conservation of Wyoming wolverines by actively participating in interagency conservation efforts, conducting inventories for wolverines in all suitable habitats in the state, integrating management actions with those that benefit other boreal forest carnivore species, monitoring population densities and trends, improving survey methodology, determining the effects of recreational and commercial activities on populations and working cooperatively with the United States Forest Service to conduct surveys for species in all potential

8

wolverine habitat. *Id*. at IV-2-94-96. In short, Wyoming's agencies play an active role in studying and managing the species, and the State has significant interest in the wolverine.

## III.   The Endangered Species Act

The purpose of the ESA is to conserve "threatened" and "endangered" species and their habitat. 16 U.S.C. § 1531. An "endangered" species is a species "in danger of extinction throughout all or a significant portion of its range." *Id*. at § 1532(6). A "threatened" species is a species "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. at § 1532(20).

To determine whether a species is either "threatened" or "endangered," the Service must review five statutorily-mandated risk factors: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." *Id*. at § 1533(a)(1). The Service must make its final listing determination "on the basis of the best scientific and commercial data available." *Id*. at § 1533(b)(1)(A). That said, this standard does not require the Service to conduct new studies or generate new

information. *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 618 (9th Cir. 2014) (citations omitted).

If a population segment of a species is considered "discrete" and "significant" in relation to the remainder of the species, the ESA requires the Service to list that "distinct population segment" (or "DPS") as "threatened" or "endangered" if the DPS meets the statutory listing criteria discussed above. 16 U.S.C. § 1532(16).

The ESA allows parties to petition the Service to list a species as "threatened" or "endangered." *See id*. at § 1533(b)(3)(A). Within ninety days of receiving a petition, to the "maximum extent practicable," the Service must publish a finding as to whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id*. If the petition presents "substantial information," the Service must initiate a status review of the species and make another preliminary finding whether listing is warranted within twelve months. *Id*. at § 1533(b)(3)(A)-(B). Within one year of publishing a proposed listing rule – and following a public notice and comment process and further consideration of the science and the threats facing the species – the Service must either promulgate a final listing rule, withdraw the proposed listing rule, or extend the one-year period for further consideration. *Id*. at § 1533(b)(6)(B)(i).

## IV.   The Service's Listing Review for the Wolverine

### a.  The Petition to List and the Twelve-Month Finding

Several environmental groups submitted the most recent petition to list the wolverine. 78 Fed. Reg. at 7866. After determining that the petition presented "substantial information," the Service issued a twelve-month finding, concluding that: (i) the wolverine population contained within the contiguous United States constituted a DPS; and (ii) listing the wolverine population in the contiguous United States (or "Contiguous DPS") was precluded by other actions necessary to list species. 75 Fed. Reg. at 78030. That said, the Service committed to the issuance of a proposed listing rule in the future. *Id*.

### b.  The Proposed Listing Decision

On February 4, 2013, the United States Fish and Wildlife Service issued a notice in the Federal Register announcing the agency's proposal to list the Contiguous DPS as "threatened" pursuant to the ESA. 78 Fed. Reg. 7864 (Feb. 4, 2013) (Proposed Rule). After reviewing the ESA listing factors, the Service determined that "Factor A: The Present or Threatened Destruction, Modification, or Curtailment of its Habitat or Range" justified listing the wolverine as a "threatened" species. *Id*. at 7877. Specifically, the Service found that the projected future impacts of climate change would reduce the wolverine's habitat to an extent that justified a "threatened" listing. *Id*.

11

In the Proposed Rule, the Service made clear that the **sole** justification for the listing rule was anticipated "habitat and range loss due to climate warming," which the Service believed would manifest itself through a reduction in snow cover in wolverine habitat. *Id.* at 7886 (finding that non-climate factors might adversely affect the wolverine **only** when considered in conjunction with the projected impacts of climate change); (AR-FR05357). The Service based its climate change conclusion on the following:

1. Wolverine need deep snow that persists through spring for both year-long and denning habitat; and

2. Climate change will substantially reduce deep snow that persists through spring for both year-long and denning habitat.

78 Fed. Reg. at 7874, 7877.

In arriving at these beliefs, the Service relied heavily upon two studies – Copeland (2010) and McKelvey (2011). (*See*, *e.g.*, AR-FR005357). In the Copeland study, the authors established a correlation between areas where snow persists through mid-May during at least one of seven years and the presence of wolverine dens. (AR-PI000749). In the McKelvey study, the authors looked at the areas where snow persists through mid-May during at least one of seven years and attempted to predict the percentage of snow cover that would be available in these areas by mid-century and by the end of the century. (AR-LIT002568). In so doing, the authors of

the McKelvey study hoped to show the projected impact of climate change to the Contiguous DPS in this century. *Id*.

In short, the authors of the McKelvey study predicted that thirty-one percent of current wolverine habitat in the contiguous United States would be lost due to climate change by mid-century and that sixty-three percent would be lost by the end of the century. 78 Fed. Reg. at 7876. The Service, in turn, concluded that this projected reduction in habitat would result in a significant reduction in population size, *id*. at 7877, and relied upon this finding to justify the proposed listing, *id*. at 7877, 7886.

### c.  The Peer Review Process

After publishing the Proposed Rule, the Service solicited peer review from seven individuals with scientific knowledge about the wolverine and its habitat. 79 Fed. Reg. at 47523. Two of these peer reviewers "disagreed substantially" with the findings in the Proposed Rule. *Id*. While the peer reviewers identified a number of concerns, the most relevant here is one peer reviewer's objection to the Service's reliance on the McKelvey study:

> The McKelvey [] analysis assumes that all reduction of spring snowpack is negative for wolverine[]. This includes all areas on all aspects at all elevations where the persistent spring snow of Copeland [] occurred. Yet by their own hypothesis, snow for dens is the critical need. Documented dens in the contiguous U.S. occur exclusively on north facing slopes at higher elevations. Therefore the loss of snow at low elevations or on any aspect other than north is unlikely to influence the availability of suitable wolverine dens. Assuming that aspects occur

> in relatively equal amounts, accounting for this factor could reduce the impact predicted by McKelvey [] by as much as 75%. Removing inconsequential losses at lower elevations where dens do not occur could further reduce the predicted impact. This is a significant oversight with serious implications for the [Service's] finding and proposed rule.

(AR-PI000751). In short, the peer review process alerted the Service to the fact that the McKelvey study might dramatically overestimate the projected future impacts of climate change. In light of the concerns of the peer reviewers regarding the Proposed Rule, the Service decided to re-evaluate the available scientific data. *See* 79 Fed. Reg. at 47533.

### d.  The Public Comment Process

The Service also received substantial input through the public comment process. *See* 79 Fed. Reg. 47522. Many of these comments were highly critical of the Service's Proposed Rule. *Id*. at 47527-47532. In particular, many of the commenters disagreed with the Service's conclusions regarding: (i) the wolverine's habitat requirements; and (ii) the validity and reliability of the available science with regard to the impact of climate change on the wolverine and its habitat. *Id*. A number of commenters objected to the lack of fine-scale modeling in the available studies, including the McKelvey study. Peer reviewers and commenters alerted the Service to the fact that the level of detail in the McKelvey study was not detailed enough for the Service to rely upon in the agency's proposed listing decision. 79 Fed. Reg. at

47527. This limitation of the McKelvey study "was of critical importance in [the Service's] reevaluation of the proposed rule." *Id.*

After receiving these comments and the peer review input, the Service reopened the public comment period for ninety days. 79 Fed. Reg. at 47523. It also extended the timeline to issue a final decision by six months in order to allow the Service additional time to re-examine the climate change issue in light of the substantial input that the Service received after publication of the Proposed Rule. *Id.* at 47523. Indeed, the Service foresaw that reconsideration might be necessary when the agency issued the Proposed Rule. 78 Fed. Reg. at 7865 ("Because we will consider all comments and information received during the comment period, our final determination may differ from this proposal.").

### e.  The Expert Panel

During the extension period, the Service convened a panel of experts on the wolverine or other mammalian carnivores, climate change, habitat modeling, and/or population ecology in order to help the Service better understand potential threats to wolverine habitat from climate change. 79 Fed. Reg. at 47522. The Service published the results of the panel discussion and made them available for public comment. *Id.* The panel collectively concluded that, while the wolverine appears to always (or almost always) require deep snow at den sites, the wolverine does not appear to always require deep snow in the wolverine's year-long habitat. (AR-

FR05362). In other words, the relationship between the wolverine and deep snow that persists through spring in the wolverine's year-long habitat is "non-obligate."

### f.  The Findings of the Service's Regional Director

On May 30, 2014, the Service's Regional Director of the Mountain-Prairie Regional Office (Regional Director) issued a memorandum that synthesized all of the input received after publication of the Proposed Rule in order to arrive at a well-informed decision. (AR-FR05357). At the outset, the Regional Director reiterated that the proposed listing of the Contiguous DPS was based on the anticipated reduction in the persistence of spring snow due to climate change. (AR-FR05371). Accordingly, "[t]he degree to which wolverine populations will be impacted by climate change in the amount or extent of deep snow limiting the availability of year-round habitat and den sites is the fundamental question that informs whether the species is likely to become endangered in the foreseeable future." *Id*.

In light of the information received following publication of the Proposed Rule, the Regional Director rejected the initial finding of the Service that climate change "will in fact cause habitat loss, den site loss, and ultimately population impacts leading to wolverine being a species likely to be endangered within the foreseeable future." *Id*. The Regional Director concluded that the Contiguous DPS was not threatened for three reasons. *Id*.

16

First, the Regional Director relied upon evidence that the Contiguous DPS continues to expand both within the areas currently inhabited as well as unoccupied suitable habitat, which indicates that the Contiguous DPS can sustain a considerable amount of habitat loss without significant impact. (*See* AR-FR05371) (noting recent dispersals in Colorado, California, and Wyoming, as well as a study published after the issuance of the Proposed Rule that estimated that the Contiguous DPS is currently occupying approximately half of its available capacity).

Second, while she recognized strong support for an obligate relationship between wolverine and deep spring snow at the den site, the Regional Director found that support for an obligate relationship between wolverine and deep spring snow throughout a wolverine's year-long habitat was lacking. (AR-FR05371). In reaching this conclusion, the Regional Director relied upon the input of the expert panel, which strongly indicated that the relationship between wolverine and deep spring snow throughout a wolverine's year-round habitat was non-obligate. (*Id*.).

Third, while she acknowledged that evidence shows that the climate is warming within wolverine habitat, the Regional Director concluded that the scientific models upon which the Service relied in proposing the listing did not have sufficient resolution to make non-speculative conclusions about the amount and persistence of snowfall at wolverine den sites. (AR-FR05372). In particular, the

Regional Director concluded that the McKelvey study did not look at den sites with

a sufficient degree of detail, stating:

> While it is correct that McKelvey [] is the most sophisticated analysis
> of the impacts of climate change at a scale specific to the wolverine [],
> the scale is not fine enough to deal with the site specific characteristics
> of wolverine dens. Wolverine dens typically occur at high elevations
> and on north facing slopes. The conclusion of habitat loss for
> wolverine[] based on loss of spring snow was based on analysis of snow
> at the overall range of the wolverine and did not scale it down to areas
> specifically selected by wolverine[] for den locations.

(AR-FR05360). In sum, the Regional Director said:

> Based on all of my analysis of the available information, I conclude that
> our primary concern about the future of [the wolverine] is associated
> with the availability of den sites. Accordingly, while I understand the
> basis of the predictions in the McKelvey [] model, I do not accept that
> a loss of snow across the range of the wolverine will result in a
> commensurate reduction in suitable wolverine habitat. Furthermore,
> due to the uncertainty of climate models, and the fact that we do not
> have the fine scale modeling available to make accurate predictions
> about the continued availability of den sites, in my best professional
> judgment, I cannot accept the conclusion about wolverine habitat loss
> that forms the basis of our recommendation to list the species.
> Accordingly, I cannot support the recommendation that we list the
> wolverine as threatened.

(AR-FR05372). The Regional Directors of the two additional Service regions that

contain wolverine supported this conclusion. (*See* AR-FR005373). Thereafter, the

Regional Director of the Mountain-Prairie Office instructed her office to prepare a

memorandum to the Director of the Service recommending withdrawal of the

proposal to list the Contiguous DPS as "threatened." (AR-FR05357).

18

### g.  The Final Listing Decision

On August 13, 2014, the Service published a final listing determination for the Contiguous DPS. 79 Fed. Reg. 47522 (Aug. 13, 2014). In so doing, the Service adopted the reasoning of the Regional Director. In particular, the Service determined that the agency could not rely upon the findings of the McKelvey study. 79 Fed. Reg. at 47536. The Service cited several studies that concluded that "a scale of resolution approximately twice as fine as that used in McKelvey [] is adequate, and that in rugged terrain (such as that used by wolverine[]), even finer models [] may be needed to represent significant microclimates." *Id.* at 47527. The Service ultimately "concluded that the analyses in McKelvey [] and other sources were not conducted at a fine enough scale to serve as the basis for having sufficient certainty about how climate change may impact wolverine habitat in the future[.]" *Id.* at 47528.

In sum, having re-evaluated the issue in light of (i) the peer review process, (ii) the comments received from the public, and (iii) the input received from the panel of experts, the Service concluded that the factors affecting the DPS did not justify listing the wolverine as "threatened" under the ESA. *Id.* Accordingly, the Service withdrew the Proposed Rule, stating that "[t]he withdrawal is based on our conclusion that the factors affecting the DPS as identified in the proposed rule are not as significant as believed at the time of the proposed rule's publication." *Id.* at 47522.

19

## STANDARD OF REVIEW

The States adopt and incorporate the standard of review provided by the Service. (*See* Dkt. No. 76 at 7-9).

## ARGUMENT

### I. The Service properly determined that the ESA's statutory criteria does not support a "threatened" listing of the Contiguous DPS.

The ESA requires the Service to list a species (or a distinct population segment of a species) as "threatened" if the species (or the DPS) is likely to become in danger of extinction within the foreseeable future. 16 U.S.C. § 1532(6), (20). In the final listing decision, the Service found that the Contiguous DPS of the wolverine is not likely to become in danger of extinction within the foreseeable future. 79 Fed. Reg. at 47544. In reaching this conclusion, the Service thoroughly examined all of the available scientific and commercial information, the statutory listing factors, and potential threats to the species. *Id*. at 47522. In so doing, the Service fully complied with the ESA.

In their challenge, the Conservation Organizations offer nothing more than a competing interpretation of the available science and a disagreement with the Service's ultimate findings. Such differences of opinion cannot satisfy "the high threshold required to set aside federal agency actions under the APA." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010). The Service's final determination, which was based on the agency's expert judgment, is entitled to

deference and should be upheld. *Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citations omitted).

**a. The Service properly determined that the anticipated effects of climate change do not merit a "threatened" listing.**

When considering whether to list a species, the ESA requires the Service to examine the five statutory factors listed in 16 U.S.C. § 1533(a)(1). In the Proposed Rule, the Service identified climate change as the **sole** factor that justified listing the Contiguous DPS as "threatened." 78 Fed. Reg. at 7864, 7886. This preliminary finding relied on these points:

(1) Wolverine need deep snow that persists through spring for their year-long and denning habitat; and

(2) The best available science shows that climate change will reduce deep snow that persists through spring for both year-long and denning habitat.

*See* 78 Fed. Reg. at 7886. Accordingly, "[t]he degree to which wolverine populations will be impacted by a change in the amount or extent of deep snow limiting the availability of year-round habitat and den sites is the fundamental question that informs whether the species is [threatened]." (AR-FR005371).

Following the issuance of the Proposed Rule, however, peer reviewers, expert panelists, and public commenters alerted the Service to several flaws in the agency's initial analysis. *See supra* at 13-16. Namely, (1) wolverine do not have an obligate relationship with deep snow that persists through spring in the wolverine's year-long range, and (2) the best available science is not sufficiently detailed to support the

Service's initial belief that climate change will substantially reduce deep snow that persists through spring at the wolverine's denning habitat. *Id*. These facts eroded any basis that could support listing the Contiguous DPS, because there is nothing left in the Service's reasoning to justify a "threatened" listing. *See supra* at 16-19. Accordingly, the Service acted properly when it withdrew the Proposed Rule. *See, e.g., Defenders of Wildlife v. Jewell*, No. 13-0919(RC), 2014 WL 4829089 (D.D.C. Sept. 30, 2014) (upholding the Service's decision to withdraw a proposed listing rule); *Nw. Ecosystem Alliance*, 475 F.3d at 1145 ("the Service may change its mind after internal deliberation" with or without citing any new data.).

Indeed, the Service recognized the possibility of withdrawal when it issued the Proposed Rule, and the Service's decision to withdraw the Proposed Rule is a testament to the real-world value of the notice and comment process required by the Administrative Procedure Act. 78 Fed. Reg. at 7865; *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980) ("Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated.") (citation omitted).

The Conservation Organizations argue that the Service should have listed the Contiguous DPS based on the rationale used by the Service in the Proposed Rule. (Dkt. No. 63 at 15-36; Dkt. No. 66 at 11-28). But the Service cannot rely upon that

22

rationale because the rationale no longer justifies listing.  Contrary to the assertions of the Conservation Organizations, the Service cannot list a species based on speculation and surmise. *Bennett v. Spear*, 520 U.S. 154, 176-77 (1997) (the "obvious purpose of the requirement that each agency 'use the best scientific and commercial data available' is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise"). Nothing in the record suggests that the Service's decision was uninformed or failed to consider relevant evidence, and the Court should defer to the Service's resolution of this scientific question. *See Trout Unlimited v. Lohn*, 559 F.3d 946, 959 (9th Cir. 2009) (upholding agency's resolution of conflicting scientific evidence, where record demonstrated that the agency "approached the [] decision in a thoughtful, comprehensive manner that balanced the agency's concerns and goals."). Accordingly, the climate change arguments advanced by the Conservation Organizations are without merit, and the Service's decision to withdraw the proposed listing should be upheld.

> **b. The Service properly determined that factors other than climate-change do not merit listing.**

In both the Proposed Rule **and** in the final listing decision, the Service concluded that the non-climate change factors did not support a "threatened" listing. 78 Fed. Reg. at 7886; 79 Fed. Reg. at 47543. This conclusion was reasonable, and the Service rationally explained its decision, which is entitled to deference. *E.g.*, *Nw. Ecosystem Alliance*, 475 F.3d at 1140 (citations omitted). Moreover, the

Conservation Organizations did not show that the Service acted in an arbitrary or capricious manner in reaching this determination.

### i. The Service properly determined that population size and genetic diversity do not merit listing.

When making a listing determination, the ESA requires the Service to consider "natural or manmade factors" that may affect the continued existence of the species. 16 U.S.C. § 1533(a)(1)(E). When the Service considered how this threat factor might affect the Contiguous DPS, the Service examined the population size of the Contiguous DPS and its potential vulnerability to the loss of genetic diversity. 79 Fed. Reg. at 47541-47543. The Service rationally determined that, while the relatively small population size and the future genetic diversity of the Contiguous DPS are potential risk factors, the best available science did not support listing the Contiguous DPS based on these factors. *Id.*

The Conservation Organizations assert that the Service should have listed the Contiguous DPS because of its small population size. (Dkt. No. 63 at 7-15; Dkt. No. 66 at 28-31). But a small population size does not, in and of itself, justify listing under the ESA. *See, e.g., Cook Inlet Beluga Whale v. Daley*, 156 F. Supp. 2d 16, 20 (D.D.C. 2001) ("Although [the Conservation Organizations] are correct that the agency has used low population as evidence to support other listing decisions, [the agency] is not required by law to list any species with a historically small or a declining population[.]"). "A species may exist in very low levels and yet still remain

24

safe from extinction. In fact, several species occur in naturally low population densities that have nothing to do with human interference. Such species, merely by virtue of their rarity, do not merit listing under the ESA." *Sw. Ctr. for Biological Diversity v. Norton*, No. 98-934 (RMU/JMF), 2002 WL 1733618, at *12 (D.D.C. July 29, 2002) (citation omitted); *Defenders of Wildlife v. Kempthorne*, 535 F. Supp. 2d 121, 129 (D.D.C. 2008) (finding that a projected loss of habitat to a small population does not, by itself, mandate listing). Accordingly, the Conservation Organizations' argument is without merit.

The Conservation Organizations also allege that the Service should have listed the Contiguous DPS due to the threat of genetic diversity. (Dkt. No. 63 at 7-15; Dkt. No. 66 at 28-31). And indeed, the Service recognized that the wolverine population of the Contiguous DPS is "low enough that they could be vulnerable to loss of genetic diversity." 78 Fed. Reg. at 7884. However, much of the science surrounding the genetic diversity of the Contiguous DPS is extremely uncertain. 79 Fed. Reg. at 47541-47543. Given the uncertainty of the science, the Service opted to give more weight to "on the ground" evidence that showed how genetic diversity was affecting the Contiguous DPS at the time of the Service's determination. 79 Fed. Reg. at 47543. This was reasonable. *See, e.g., Trout Unlimited*, 559 F.3d at 959 (upholding agency's resolution of conflicting scientific evidence, where record demonstrated

25

that the agency "approached the . . . decision in a thoughtful, comprehensive manner that balanced the agency's concerns and goals.").[6]

In short, the Service found that "[t]o date, no adverse effects of the lower genetic diversity of the contiguous U.S. DPS of wolverine[] have been documented." 79 Fed. Reg. at 47542. The Service rationally determined that, while the size of the wolverine population in the Contiguous DPS "suggests that populations are low enough that they could be vulnerable to loss of genetic diversity in the future," the lack of adverse effects on the ground supports the Service's conclusion that population size and genetic diversity do not pose a current threat to the Contiguous DPS. 79 Fed. Reg. at 47542; *Cook Inlet*, 156 F. Supp. 2d at 21-22 (holding that the ESA does not require listing "simply because the agency is unable to rule out factors that **could** contribute to a population decline") (emphasis added). Accordingly, the Service acted properly in not listing the Contiguous DPS based on population size and/or genetic diversity.

---

[6] The emergence of new information could lead to a future decision to list the Contiguous DPS. A decision not to list a species is not final for all time. Under the ESA, the Conservation Organizations may petition to list the Contiguous DPS at any time based on new information. 16 U.S.C. § 1533(b)(7). The Service may also propose to list a species on the agency's own initiative and may do so on an emergency basis where appropriate. *Id*.

26

### ii. The Service properly determined that existing regulatory mechanisms do not merit listing.

The ESA requires the Service to consider whether a species must be listed due to the "inadequacy of existing regulatory mechanisms." 16 U.S.C. § 1533(a)(1)(D). The Conservation Organizations allege that the Service failed to properly consider this potential risk factor. (Dkt. No. 66 at 33-35). To the contrary, the Service considered the potential inadequacy of existing regulatory mechanisms. 79 Fed. Reg. at 47541. In particular, the Service looked at how regulations promulgated under the Wilderness Act of 1964, 16 U.S.C. §§ 1131-1136, might affect the Contiguous DPS. *Id*. The Service found that the Wilderness Act would protect large amounts of wolverine habitat from direct loss or degradation. *Id*. Thus, regulations promulgated under the Wilderness Act are not a justification for listing the wolverine as "threatened." *Id*.

The Service also examined potential impacts from Montana's regulations, which authorize limited trapping of wolverine. *Id*. The Service determined that Montana's trapping regulations did not pose a threat to the Contiguous DPS sufficient to warrant listing because Montana's trapping season was closed indefinitely at the time the Service made its decision. *Id*.

Lastly, the Service addressed the issue of climate change regulation. *Id*. The Service determined that, because the agency already concluded that the anticipated effects of climate change did not merit listing the Contiguous DPS as "threatened,"

27

the adequacy of climate change regulations was irrelevant to the Service's listing inquiry. 79 Fed. Reg. at 47541. This approach is entirely consistent with the ESA. *See, e.g., Rocky Mountain Wild v. U.S. Fish and Wildlife Service*, No. CV 13-42-M-DWM, 2014 WL 7176384, *10 (D. Mont. Sept. 29, 2014) ("The Service's determination of whether additional regulatory protection of a species is necessary is inextricably linked to the Service's threat determinations.") (citing *Friends of Blackwater v. Salazar*, 691 F.3d 428, 436 (D.C. Cir. 2012)). As the court in *Blackwater* held:

> [H]aving considered all the other types of threats listed in [ESA Section] 4(a)(1) and found no existing conditions [] threatened the subspecies, the Service could reasonably, indeed readily, conclude the squirrel did not require additional regulatory protection.

*Friends of Blackwater*, 691 F.3d at 436. So it is here. Accordingly, the Service complied with the ESA, and the arguments put forth by the Conservation Organizations are without merit.

### iii. The Service properly determined that cumulative effects do not merit listing.

As part of the Service's analysis of the listing factors, the ESA requires the Service to consider if "a combination" of the five statutory factors require listing the species at issue as either "threatened" or "endangered." 50 C.F.R. § 424.11(c). The

Conservation Organizations allege that the Service failed to properly consider this potential risk factor. (Dkt. No. 66 at 31-33). Not so.

In the final listing decision, the Service examined the potential risk posed by each of the listing factors individually and in great detail. 79 Fed. Reg. 47532-47539 (discussing Factor A); *id*. at 47539-47541 (discussing Factor B); *id*. at 47541 (discussing Factor C); *id*. (discussing Factor D); *id*. at 47541-47543 (discussing Factor E). The Service also considered the potential risks posed by a combination of all of the listing factors:

> We find that absent a threat resulting from climate change, no other stressor rises to the level of a likely risk of extinction to the DPS, **either individually or cumulatively**, that results in the wolverine DPS meeting the definition of an endangered or threatened species under the Act.

79 Fed. Reg. at 47531 (emphasis added). In so doing, the Service complied with the ESA.

The Conservation Organizations argue that the Service should have done a more fulsome job explaining its reasoning with regard to the agency's cumulative effects analysis. (Dkt. No. 66 at 32-33). Yet the Service's reasoning can be readily discerned in the agency's final decision, particularly in light of the agency's lengthy discussion of how each of the individual risk factors may affect the Contiguous DPS. The Service considered each of the risk factors in depth, and the Service considered the combined impact as well. This is more than sufficient. *Motor Vehicle Mfrs. Ass'n*

*v. State Farm Mutual Auto Ins.*, 463 U.S. 29, 43 (1983) (stating that a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (citation omitted); *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 205-206 (D.D.C. 2012) (upholding the Service's analysis of combined effects in a similar factual scenario). The argument put forward by the Conservation Organizations is without merit.

## II.   The Conservation Organizations did not show that the Service acted improperly.

The Conservation Organizations argue that the Service acted improperly during the agency's decision-making process. (*E.g.*, Dkt. No. 63 at 22; Dkt. No. 66 at 22-23). These arguments are also without merit.

### a.  The allegations of improper influence are without merit.

The Conservation Organizations attempt to portray the Service's decision-making process as one filled with improper political influence trumping the best available science. (*E.g.*, Dkt. No. 63 at 22; Dkt. No. 66 at 22-23). In so doing, the Conservation Organizations allege that the Service ignored the advice of the agency's biologists in favor of political considerations. (*Id.*). As an initial matter, this entire construct is fatally flawed – the supposed villain whom the Conservation

Organizations allege ignored and overrode the opinions of the agency's biologists, the Service's Regional Director, is herself an experienced biologist.[7]

Moreover, the Conservation Organizations did not show the type of political influence that would invalidate the Service's decision. To state a cause of action for improper political influence, there must be some factual basis for a claim that: (1) the content of the pressure on the agency was to force it to decide upon factors not made relevant by Congress in the applicable statute; and (2) the agency's determination must have been affected by those extraneous considerations. *Sierra Club v. Costle*, 657 F.2d 298, 409 (D.C. Cir. 1981). The Conservation Organizations made no attempt at such a showing here. (*See* Dkt. No. 63 at 22; Dkt. No. 66 at 22-23).

The Service's decision was based solely on the statutory listing factors and the administrative record, and an agency is entitled to a presumption of regularity. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). And even if this Court was inclined to accept the assertion that political pressure played a role here, "[t]hese bits of evidence show that the agency's decision was a difficult one and that political considerations may have been lurking in the corridors. The facts do not establish that, but for 'politics,' the [species] would have been listed under

---

[7] http://www.fws.gov/mountain-prairie/aboutus.html (last visited on August 17-, 2015).

the ESA or that political considerations became part of the decision making process." *Cook Inlet*, 156 F. Supp. 2d at 22.

### b. The Conservation Organizations misrepresent the deliberative process inherent to rulemaking.

Throughout their respective briefs, the Conservation Organizations repeatedly allege that the Service acted improperly because the agency's final listing decision conflicts with the personal opinions of a few agency staff members. (*E.g.*, Dkt. No. 63 at 22; Dkt. No. 66 at 22-23). It is well settled that the opinion of an agency staff member is not the final position of the entire agency. *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1174-75 (9th Cir. 2004) (holding that an informal exchange between agency employees did not represent the official view of the agency); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998) ("[D]eference is owed to the decisionmaker authorized to speak on behalf of the agency, not to each individual agency employee."); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007).

The mere presence of a disagreement between agency personnel is hardly evidence of improper behavior. Quite the contrary. Agency personnel take part in the deliberative process, which can often result in disagreements along the way. "That the administrative record . . . reflects a certain amount of disagreement among the countless individuals involved in developing or commenting on [the agency's proposal] is inevitable and indicates that debate was as open and vigorous as

Congress intended." *Nat'l Fisheries Inst. v. Mosbacher*, 732 F. Supp. 210, 227 (D.D.C. 1990). Cherry-picked remarks by agency personnel are entitled to no weight from the Court. The remarks highlighted by the Conservation Organizations are simply an attempt to divert this Court's attention from the Service's final decision, which must be judged on the reasons stated by the **agency** and the support found in the record. *See, e.g., Overton Park*, 401 U.S. at 420.

## III.   The Service properly determined that the wolverine is not "threatened" throughout a "significant portion of its range."

The Conservation Organizations also challenge the Service's interpretation and application of the ESA phrase "significant portion of its range." (Dkt. No. 63 at 38-41; Dkt. No. 66 at 35-41). Contrary to their allegations, the Service reasonably interpreted the phrase as used in the ESA, and the Service properly applied the agency's interpretation in arriving at the decision to withdraw the Proposed Rule. Accordingly, the Conservation Organizations' arguments lack merit.

### a.   The phrase "significant portion of its range"

The ESA requires the Service to list as "threatened" any species that is "likely to become an endangered species within the foreseeable future throughout all or a **significant portion of its range**." 16 U.S.C. § 1532(20) (emphasis added). It is well established that the statutory phrase "significant portion of its range" (SPR) is ambiguous. *See*, *e.g.*, *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001). Accordingly, it is the role of the agency tasked with implementing the ESA

to interpret the meaning of the ambiguous statutory language. *City of Arlington v. FCC*, --- U.S. ---, 133 S. Ct. 1863, 1868 (2013) ("if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.") (quoting *Chevron v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)).

Before 2007, the Service had not issued a formal interpretation of the SPR language. Given the ambiguous statutory language and the absence of a formal interpretation from the Service, some courts developed theories of how SPR should be interpreted. *See, e.g., Ctr. for Biological Diversity v. Norton*, 411 F. Supp. 2d 1271 (D.N.M. 2005), *vacated pursuant to settlement by Ctr. for Biological Diversity v. Kempthorne,* No. CIV 03-252 LFG/LAM, 2007 WL 6477262 (D.N.M. July 2, 2007). For its own part, the Ninth Circuit found that: (i) the SPR phrase must have independent utility and cannot be read as superfluous language, and (ii) the Service must explain whether any lost historical range constitutes a "significant portion of its range." *Defenders of Wildlife*, 258 F.3d at 1145.

In 2007, the Service issued a legal opinion that interpreted the statutorily ambiguous SPR phrase. 76 Fed. Reg. at 76988. The Service's legal opinion was consistent with the Ninth Circuit's holding that the SPR phrase must have independent utility, but the Service rejected the Ninth Circuit's position that the Service must determine whether any lost historical range constitutes a "significant

portion of its range."[8] For reasons that are beyond the scope of the instant litigation, the Service withdrew the legal opinion on May 4, 2011. 76 Fed. Reg. at 76988.

On July 1, 2014, the Service, together with the National Marine Fisheries Service, issued a revised interpretation of the phrase "significant portion of its range." 79 Fed. Reg. 37578-37580. This interpretation is entitled to deference. *E.g.*, *Nw. Ecosystem Alliance*, 475 F.3d at 1140 (citations omitted).

### b. The Service's SPR interpretation is reasonable and entitled to deference.

"When a court reviews an agency's construction of the statute which it administers, [the court] is confronted with two questions." *Chevron*, 467 U.S. at 842. First, the court must determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842-843. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

Here, it is well settled that the phrase "significant portion of its range" is ambiguous. *See*, *e.g.*, *Defenders of Wildlife*, 258 F.3d at 1141. Therefore, under *Chevron*, the only question for this Court to decide is whether the Service's

---

[8] The M-Opinion can be found at http://www.doi.gov/solicitor/opinions/M-37013.pdf.

interpretation is based on a "permissible construction of the statute." 467 U.S. at 843. The Service cleared this hurdle by providing a reasoned and rational explanation that shows that the agency's interpretation is based on a thorough analysis of the ESA and the Service's experience implementing the Act. The Service's 2014 interpretation can be boiled down to three critical determinations:

First, the Service recognized that the SPR phrase "provides an independent basis for listing." 79 Fed. Reg. at 37609. The Service explained that "there are two situations (or factual bases) under which a species would qualify for listing: a species may be endangered or threatened throughout all of its range **or** a species may be endangered or threatened throughout only a significant portion of its range." *Id.* (emphasis added). The Conservation Organizations do not challenge this interpretation.

Second, the Service explained when that "independent basis" may come into play. *Id*. The Service clarified that a "portion of the range of a species is 'significant' if the species is not currently endangered or threatened throughout its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range." *Id*. The Conservation Organizations do not challenge this interpretation.

Third, the Service clarified that the "range of a species is considered to be the general geographic area within which that species can be found at the time FWS or NMFS makes any particular status determination." *Id.* In other words, the Service rejected the position adopted by some courts that the Service must determine whether any lost historical range constitutes a "significant portion of its range" prior to making a listing determination. It is this interpretation with which the Conservation Organizations take issue. Their arguments lack merit.

The Service "interpreted the term 'range' to be the general geographic area within which the species is currently found, including those areas used throughout all or part of a species' life cycle, even if not used on a regular basis." *Id.* at 37583. The Service reached this conclusion based on the text of the ESA:

> As defined by the Act, a species is endangered only if it "is in danger of extinction" throughout all or a significant portion of its range. The phrase "is in danger" denotes a present-tense condition of being at risk of a current or future event. Hence, to say a species "is in danger" in an area where it no longer exists – *i.e.*, in its historical range where it has been extirpated – is inconsistent with common usage. Thus, "range" must mean "current range," not historical range.

*Id*. This eminently reasonable interpretation is entitled to deference. *E.g.*, *Nw. Ecosystem Alliance*, 475 F.3d at 1140 (citations omitted).

In an attempt to attack the Service's SPR interpretation, the Conservation Organizations rely upon the Ninth Circuit ruling in *Defenders of Wildlife*, which held that the Service must consider whether any lost historical range constitutes a

"significant portion of its range." (Dkt. No. 66 at 35-38) (citing *Defenders of Wildlife*, 258 F.3d at 1145). This argument fails to acknowledge the "now-canonical" ruling in *Chevron*. *See City of Arlington*, 133 S. Ct. at 1868. Specifically, in *Chevron* the Supreme Court made clear that "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U.S. at 844. So, while the Ninth Circuit's interpretation of the ambiguous SPR phrase may be a fair one, the Ninth Circuit's interpretation must yield in the face of a reasonable interpretation made by the Service. *Id*. at 866 ("federal judges – who have no constituency – have a duty to respect legitimate policy choices made by those who do"); *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir. 2006) (noting that reviewing courts must "not substitute [their] judgment for that of the agency") *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7 (2008). In other words, so long as the Service's interpretation of "range" is reasonable, which it is, the Conservation Organizations cannot rely upon the *Defenders of Wildlife* opinion and its progeny to support their argument.

Indeed, the Supreme Court considered this precise scenario – the seeming conflict between the principles of *Chevron* and *stare decisis*. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981-982 (2005). The Supreme Court held that "[a] court's prior judicial construction of a statute trumps

an agency construction otherwise entitled to *Chevron* deference **only** if the prior court decision holds that its construction follows the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id*. at 982 (emphasis added). Just as in *Brand X*, that is not the situation here. When, as here, an agency interprets ambiguous statutory language, courts must defer to the agency's interpretation, provided that it is reasonable, regardless of an earlier interpretation of the statute by a court. *Id*. at 982-983 ("[o]nly a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction").

In any event, the Service conducted the functional equivalent of what the Ninth Circuit was looking for in *Defenders of Wildlife*. As the Service clearly and cogently explained in the 2014 interpretation, while the Service will not "explicitly consider whether lost historical range is itself an SPR," the Service **will** consider "the effects of loss of historical range on the current status of the species[.]" 79 Fed. Reg. at 37584. "If lost historical range had indeed been [the equivalent of] an SPR prior to its loss, then, with the loss having occurred, the species should currently be endangered or threatened in its remaining current range." *Id*. Thus, the Service **is** considering the loss of historical range on species – it is just that the Service's interpretation of the ESA means that the Service will consider the impact of the loss of historical range on the status of the species rather than in an SPR determination.

39

The Service's interpretation is entitled to *Chevron* deference regardless of the fact that the Service interpreted the phrase "significant portion of its range" differently in the past. As the Supreme Court said in *Chevron*, "[a]n initial agency interpretation is not instantly carved in stone. On the contrary, the agency [] must consider varying interpretations and the wisdom of its policy on a continuing basis[.]" *Chevron*, 467 U.S. at 863–864; *Brand X*, 545 U.S. at 981-982. That is precisely the situation here. Accordingly, this Court should uphold the Service's interpretation.

### c.  **The Service properly conducted the SPR analysis.**

In addition to their challenge to the Service's SPR interpretation, the Conservation Organizations argue that the Service improperly conducted the SPR analysis. (Dkt. No. 63 at 38-41; Dkt. No. 66 at 38-41). Namely, the Conservation Organizations allege that the Service failed to consider how trapping and climate change might affect a particular portion of the wolverine's range. (*Id.*). These allegations are without merit. The Service "examined potential threats due to human use and disturbance of habitat, trapping, and effects of climate change" and "found no concentration of threats that suggests that the DPS of the North American wolverine may be in danger of extinction in a portion of its range." 79 Fed. Reg. at 47545.

The Conservation Organizations also claim that the Service failed to consider whether the southern Rockies and the Sierra Nevada constitute a significant portion of the wolverine's range. (Dkt. No. 63 at 38-41). The Service's own words refute this allegation. 79 Fed. Reg. at 47545. The Service examined the entirety of the wolverine's range, including the southern Rockies and the Sierra Nevada, and the agency "found no portions of the range where potential threats are significantly concentrated or substantially greater than in other portions of the range." *Id*. The Service also "found no portions of the range where potential threats are significantly concentrated or substantially greater than in other portions of the range." *Id*. "Therefore, no portion of the range of the DPS of the North American wolverine warrants further consideration of possible endangerment or threatened species status under the Act." *Id*. Accordingly, the Conservation Organizations' argument is without merit.

## CONCLUSION

For the foregoing reasons, the states of Idaho, Montana, and Wyoming respectfully request that this Court grant their motion for summary judgment.

Dated this 17th day of August, 2015.

ATTORNEYS FOR DEFENDANT-
INTERVENORS

*/s/ Michael J. McGrady*

Jeffrey M. Hindoien
Gough, Shanahan, Johnson & Waterman, PLLP
33 S. Last Chance Gulch
Helena, MT 59601
(406) 442-8560 (phone)
(406) 442-8783 (fax)
jeffh@gsjw.com

Michael J. McGrady
Wyoming Attorney General's Office
123 State Capitol
Cheyenne, WY 82002
(307) 777-6946 (phone)
(307) 777-3542 (fax)
mike.mcgrady@wyo.gov

Tim Fox
Attorney General of Montana
215 North Sanders
PO Box 201401
Helena, MT  59620-1401
ph: (406) 444-2026
fax: (406) 444-3549
timfox@mt.gov

Rebecca Dockter
Chief Legal Counsel
Zach Zipfel
Agency Legal Counsel
Special Assistant Attorneys General
Montana Department of Fish, Wildlife and Parks
1420 East Sixth Avenue
PO Box 200701
Helena, MT  59620-0701

ph: (406) 444-4047; 444-2551
rdockter@mt.gov; zzipfel@mt.gov
*Attorneys for State of Montana and*
*Montana Department of Fish, Wildlife and Parks*
*Defendant Intervenor*

Samuel Eaton
Idaho Office of Species Conservation
304 N. 8th St., Ste. 149
Boise, ID 83702
(208) 334-2189
(208) 334-2172 (Fax)
sam.eaton@osc.idaho.gov

## CERTIFICATE OF COMPLIANCE

I hereby certify that, according to the word count function of Microsoft Word 2013, the foregoing brief is 9484 words, excluding the caption, table of authorities, table of contents, signature blocks, certificate of compliance and certificate of service.


*/s/ Michael J. McGrady*
Michael J. McGrady


## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2015, I electronically filed the foregoing with the Clerk of the U.S. District Court of Montana, Missoula Division, using the CM/ECF system, which sent a Notice of Electronic filing to all counsel of record.


*/s/ Michael J. McGrady*
Michael J. McGrady